# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| CHARLES SHARRIEF, as next friend of CHRISTOPHER KEYS, a minor,      Plaintiff, <br><br> vs. <br><br> THE ALABAMA HIGH SCHOOL ATHLETIC ASSOCIATION ("AHSAA"), *et al.*,      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) )      Civil Action No. CV-04-S-2679-NE |

## MEMORANDUM OPINION

Plaintiff Christopher Keys is an eighteen-year-old student at North Jackson High School in Stevenson, Alabama.  Reputedly, he is one of the most sought after college football prospects in the Nation.  The rub lies in the fact that the Alabama High School Athletic Association declared Keys ineligible to participate in interscholastic sports during the present, 2004-2005 school year.  This suit resulted.  Evidence and argument on plaintiffs' motion for a temporary restraining order and preliminary injunctive relief, as well as defendants' motion to dismiss, was heard on September 23 and 24, 2004.[1]  Following full consideration of the pleadings,

---

[1]The hearing originally was set for September 16, 2004, but was rescheduled due to the closing of the United States Courthouses in Birmingham and Huntsville, Alabama, as a result of severe storms generated by the Hurricane named "Ivan."

testimony, exhibits, and arguments of counsel, the court enters the following opinion.

## I. FACTUAL BACKGROUND

Christopher Keys was born on April 26, 1986, in Opelousas, St. Landry Parish, Louisiana.[2] Prior to the commencement of the present school year, he resided within that State. During the immediately preceding, 2003-04 academic year, Keys attended Port Barre High School in St. Landry Parish, Louisiana. Before the end of that school year, however, Keys was expelled from Port Barre High School for possession of marijuana on the school's campus. He completed the remainder of his academic requirements at the St. Landry Parish Alternative School. As the result of his expulsion (for a period of 24 months), Keys became ineligible to participate in interscholastic athletics at the high school level in Louisiana.[3]

During the summer of 2004, Keys nevertheless attended a football camp at Louisiana State University, in Baton Rouge, Louisiana. Ali Sharrief, who is the son of plaintiff Charles Sharrief and a talented running back and outside linebacker on the North Jackson High School football squad, also attended the camp, as did the head coach of North Jackson's football team, Mark Rose.[4] Ali Sharrief and Keys became

---

[2]*See* Plaintiffs' Ex. 3, at unnumbered page 9 (Birth Certificate).

[3]*Id.* at unnumbered pages 4-6; *see also* Plaintiffs' Ex. 5, at unnumbered pages 2-3.

[4]Coach Rose maintained that he did not meet or become aware of Keys until some date after the conclusion of the LSU football camp.

fast friends, and Keys told Sharrief about his ineligibility to play football in Louisiana during his senior year of high school.  Ali Sharrief inveigled his father to allow his newfound friend to reside with their family in Jackson County, Alabama during the present school year, on the assumption that Keys could transfer to North Jackson High School and play football for its team.   Charles Sharrief initially was not receptive to his son's blandishments, considering the reason for Keys's expulsion from Port Barre High School.  After talking by telephone with Keys and members of his family over a several week period, however, he ultimately assented.

Millie and Charles Sharrief were awarded legal custody of Keys by the 27th Judicial District Court in St. Landry Parish, Louisiana, on July 26, 2004.[5]   The custody order was registered as a foreign judgment in the Circuit Court of Jackson County, Alabama, pursuant to Alabama Code § 30-3B-305 (1975), and registration of the order was confirmed by a circuit judge of that county on August 24, 2004.[6]  On some date after Mr. and Mrs. Sharrief obtained custody of Keys, he moved to Alabama to reside with them.  Charles Sharrief submitted an application to enroll Keys in North Jackson High School on July 27, 2004.  The application was accepted, and Keys began attending North Jackson High School on August 9, 2004, the first

---

[5]Doc. no. 1 (Complaint) at ¶ 5 and Plaintiffs' Ex. 1.

[6]Plaintiffs' Ex. 2.

day of the 2004-2005 school year.

Defendant Alabama High School Athletic Association ("AHSAA" or "the Association") is headquartered in Montgomery, Alabama, and it

> is a private agency which was founded in 1921 by its member schools to regulate, coordinate, and promote their athletic programs. The AHSAA is a voluntary association comprised of both public and private schools in the State of Alabama, including North Jackson High School in Stevenson, Alabama. There are currently 787 member schools with more than 100,000 student-athletes participating in the various sports programs selected by the member schools.
>
> The AHSAA has a Constitution and By-Laws which govern its affairs and the operation of its programs and activities, which include student-athlete eligibility, athletic contests[,] and championship programs. The rules-making body of the AHSAA is the Legislative Council[,] which is composed of 34 members from the eight athletic districts in the state of Alabama. In turn, each athletic district contains a district board made up of four members elected by the member schools in each district. The Legislative Council has the authority to make changes in the Constitution and By-Laws of the AHSAA with a two-thirds majority vote. If the Legislative Council votes to pass a proposal, the Central Board of Control implements the proposal.
>
> The Central Board of Control is the governing body of the AHSAA. The Central Board consists of fifteen members—one member elected from each district, one member elected from each bi-district, a representative from the State Department of Education[,] and two female at-large members. The Central Board is the executive board with final authority in AHSAA matters.
>
> The AHSAA publishes its Rules and Regulations (as approved by the Legislative Council and implemented by the Central Board of Control) on an annual basis in the AHSAA Handbook. The AHSAA Handbook is provided to the superintendents, principals, and athletic

4

directors of the member schools at the beginning of each school year.

One of the main functions of the AHSAA is to interpret, enforce and apply the athletic eligibility requirements established by its member schools and contained in the AHSAA Handbook.[7]

The AHSAA Handbook sets forth the following rules, among many others, that each member school must follow in order to demonstrate the eligibility of its student athletes:

**SECTION 1.**   A superintendent or principal shall, when requested, furnish to the Boards such information as they may desire bearing upon the eligibility of contestants from his school. A failure to comply within a reasonable time shall forfeit a school's membership in the Association.

**SECTION 2.** At least five days before a student can participate in a contest of any athletic year, that student's name must have been submitted to the State Office by the school principal on an Official Eligibility List (Form 3) or a Second Semester Only Eligibility Form (No. 3A). A student whose name appears on a school's current eligibility printout does not have to be submitted again. These forms should not be submitted until the student becomes eligible.

A student whose name appears on the printout of a former school or has been deleted from the current school printout must be submitted again by the current school at least five days before the student can participate in a contest.

During the school year, additional names may be submitted on a Form 3, but they must be submitted five days prior to the contest in which each student participates.

---

[7]Doc. no. 4 (Response in Opposition to Motion for Temporary Restraining Order and Preliminary Injunction, and Motion to Dismiss), Ex. 1, at 1-2 (affidavit of Dan Washburn).

If all the required information on a Form 3 is not submitted for any student listed, that student is not eligible for any contest. To submit cheerleaders who do not participate in interscholastic athletics, list their name and check the "Cheerleader Only" column on the Form 3.

Form 3s listing students for the following school year will not be processed until after June 1 and should not be submitted before that date. All Form 3s submitted must include units passed and the composite average for the preceding school year.

The penalty for failure of the school to file such report shall be suspension from the Association and/or the assessment of a monetary fine.[8]

Dan Washburn, Executive Director of the AHSAA, testified that the Association normally accepts the certification of eligibility for all students whose names appear on an "Official Eligibility List (Form 3)" submitted by a member school, unless a complaint about a particular student's eligibility is received by the Association. As noted in Article X of the *Alabama High School Athletic Association 2004-05 Handbook*, however, the Association also "may take action in a case without receiving a formal complaint."[9]

Washburn received a copy of a Louisiana newspaper article from Tommy Henry, the Commissioner of the Louisiana High School Athletic Association, on July

---

[8]Defendants' Ex. 1 (Alabama High School Athletic Association Handbook, 2004-05), at 33-34.

[9]*Id.* at 20.

6

13, 2004.[10]  The article noted Keys's ineligibility to compete in Louisiana, and his

intention to play football during his senior year for North Jackson High School in

Stevenson, Alabama.  In full text, the article reads as follows:

> the advocate **Sports**
> **LSU recruit Keys to continue prep career in Alabama**
> By WILLIAM WEATHERS
> wweathers@theadvocate.com
> Advocate sportswriter
>
> Former Port Barre High football standout and LSU recruit Chris Keys,
> who was expelled from the St. Landry Parish School after being arrested
> for possession of marijuana on the school's campus, will complete his
> high school playing career in the State of Alabama.
>
> Port Barre football coach Donnie Perron said that Keys, who committed
> to LSU in March and still plans to sign with the Tigers in February, has
> transferred to North Jackson High School, located in the northeast area
> of the state in Stevenson.
>
> "It's a good opportunity for Chris to play and fulfill his dreams of going
> to LSU,"  Perron said.
>
> Keys, a two-time Class 2A All-State selection in football and three-sport
> letter-winner, is already working out with his new team.  North Jackson,
> a Class 4A school, has won more than 40 games over the past four
> seasons under coach Mark Rose, finishing 8-2 last season.
>
> Keys has moved in with the family of North Jackson standout running
> back/outside linebacker Ali Sharrief, whom he befriended during LSU's
> football camp in May.
>
> Perron said that the Sharriefs are in the process of gaining legal
> guardianship of Keys, a move that would make him immediately eligible

---

[10]*See* Defendants' Ex. 13.

to play for North Jackson.

Keys, 18, was expelled April 28 along with another classmate. He later attended an alternative school in Opelousas, where he completed the school year and attained all of his necessary credits.

Because he was expelled, Keys was no longer eligible to compete for a school in the Louisiana High School Athletic Association.

"Chances are very slim that he would have been eligible at an LHSAA school," LHSAA Commissioner Tommy Henry said. "If a student is expelled and they go to another school outside their attendance zone they're not eligible. And if the student were to move (to another Louisiana school zone) it would be considered a move to create eligibility."

Perron said Keys, a 3.0 grade point average student, initially considered attending either a college preparatory school or military school in Virginia, neither of which proved to be cost prohibitive [sic].

"Chris is probably one of the best all-around athletes, if not the best, to come out of Port Barre," said Perron, "He made a mistake that put him on a detour. Sometimes you need to get out of your environment and re-establish yourself, and that's what he's going to do. It seems like he's going to a really nice family. He won't have much idle time."

Keys must still resolve his legal situation in Louisiana. He appeared before state District Judge Alonzo Harris on June 18, but did not enter a plea because the district attorney's investigation has not been completed. No other date for Keys' arraignment has been scheduled.

Keys passed for 709 yards and six touchdowns and rushed for 510 yards and 10 scores as a junior. He also recorded 57 tackles, seven interceptions and kicked 31 extra points and a pair of field goals.

Keys, a four-year starter in basketball, won the Class 2A state outdoor javelin title as a sophomore and was the indoor shot put champion as a

junior.

"It's almost like losing three players with Chris," Perron said, " It wasn't a fun day at school when all this happened.  It was a traumatic thing for Chris and his family.  He made a mistake and now he's been given a chance to rectify it."

Perron said LSU's scholarship offer to Keys remains firm, contingent that he avoids any further legal trouble.

"I think (LSU) coach (Nick) Saban handled it well," Perron said.  "He didn't turn his back on Chris.  He left the door open and for him not to get into trouble again."

"I'm not surprised because that's evident on his own squad," Perron said.  "He gives people second chances until he has to cut them loose. I'm hopeful that everything will work out for Chris."

*(Advocate sportswriter Robin Fambrough and Bobby Ardoin contributed to this report.)*[11]

Later that week, Washburn discussed the newspaper article with North Jackson head football coach Mark Rose, who was attending a statewide clinic for high school coaches at the Civic Center in Montgomery.  Washburn advised Rose to ensure that Keys complied with AHSAA eligibility requirements before allowing him to play.  Coach Rose assured Washburn that he would gather and submit all documentation relating to Keys's eligibility.

Washburn also telephoned Frank Stevens, a man who serves North Jackson High School in two capacities, Principal *and* Athletic Director:  a fact that may speak

---

[11]Defendants' Ex. 13, at 2-3.

loudly about the school's priorities.  This telephone call was placed on July 20, 2004,

seven days prior to Keys's enrollment.  Washburn also advised Stevens to ensure that

Keys met AHSAA eligibility requirements before allowing him to take a snap under

center.  Following this telephone conversation, Stevens instructed Coach Rose to

obtain documentation supporting Keys's eligibility.  Rose did so and, on July 28,

2004, presented the paperwork to Washburn in AHSAA's Montgomery office.  After

reviewing the information presented, Washburn stated that, in his opinion, Keys was

*not* eligible to compete in AHSAA-sanctioned, interscholastic athletics.  Washburn's

statement was not an "official ruling," however.[12]

---

[12]*See* Defendants' Ex. 1 (*AHSAA 2004-05 Handbook*, art. X), at 20 ("To receive an official ruling on any case, the principal of a member school must request a ruling in writing to the Executive Director.  A verbal opinion or statement is not an official ruling."); and Plaintiffs' Ex. 14 (July-August 2004 issue of the *AHSAA Bulletin*), at 10, which reads in part as follows:

**Official AHSAA Rulings Are Given In Writing Only**
 The Constitution of the Alabama High School Athletic Association requires that rulings be given in writing only (Article X, Note, of the AHSAA Handbook).  The Handbook states that *a verbal opinion or statement is not an official ruling*.
 Many principals, coaches and parents call the State Office with questions concerning eligibility.  In an effort to serve school authorities in the most expedient manner possible, Executive Director Dan Washburn and his staff give verbal opinions and statements on the phone.
 However, Washburn wants every principal and coach to be aware of the rules and procedures of the AHSAA and that verbal opinions are given according to the application of the rules governing eligibility.  *To get an official ruling on any case, it must be submitted in writing to the Executive Director*.
 It is the policy of the State Office to give official rulings in writing only upon request of a school principal.  The rulings are based on the facts presented in the letter of request.  In this regard the ruling can only be as accurate as the information given.  * * * *  [Boldface emphasis in original; italicized emphasis added.]

Stevens submitted a written request for an official ruling of eligibility on July

30, 2004.[13]   In support, Stevens submitted letters from the principal, assistant

principal, and football coach of Port Barre High School, the Louisiana court order

transferring custody of Keys to Mr. and Mrs. Sharrief, and Keys's school records and

birth certificate.[14]   Washburn ruled as follows in a letter dated August 2, 2004:

> I am in receipt of your letter of July 30, 2004 requesting an official ruling concerning the athletic eligibility of a transfer student into your school from Louisiana.  Christopher Donnie Keys is transferring from Port Barre High School in Port Barre, Louisiana.  I received the enclosures which included letters from Mr. Duplechain, Principal, Port Barre High School, Mr. Jerome Robinson, Assistant Principal, and the football coach, Mr. Donnie Perron.  They all stated their confidence in this student to perform both academically and athletically.  You also enclose a court order from the Saint Landry Parish Clerk of Court ordering legal custody to Charles and Millie Sharrief.  Mr. and Mrs. Sharrief reside in the North Jackson school district.  You also enclosed copies of Chris Keys [sic] permanent record and his birth certificate.
>
> You may find on page 32 of the 2004-2005 Handbook, Section 16:  "Any student who is under temporary suspension or whose character or conduct is such as to reflect discredit upon the school is not eligible.  A student's attendance, attitude and classroom efforts must be acceptable to the school in which the student is enrolled.  A transfer student must be in good standing with the student's previous school."  In Mr. William Duplechain's letter, Mr. Duplechain states: "Christopher Keys was suspended indefinitely and recommended for expulsion for possessing a controlled dangerous substance governed by UCDSL.[15] Subsequently he was expelled by the superintendent for a period of 24

---

[13]*See* Plaintiffs' Ex. 3, at unnumbered page 2.

[14]Defendants' Ex. 2.

[15]Uniform Controlled Dangerous Substances Law.

calendar months in accordance with Louisiana State Law." Additional information in Mr. Duplechain's letter states: "Because of his expulsion, he is athletically ineligible at Port Barre High School for the 2004-2005 school year and the 2005-2006 school year."

Based on the above information, Chris Keys is ineligible to participate in interscholastic athletics at any member school of the Alabama High School Athletic Association. This ruling is based on the fact that he is not in good standing with his previous school, Port Barre High School, having been expelled and ruled not eligible to participate in interscholastic athletics.

In addition, Chris Keys is also ruled ineligible under the Transfer Rule. You will find on page 30 of the 2004-2005 Handbook under the Transfer Rule, Custody and legal guardianship: "Custody or legal guardianship assigned to anyone (including relatives) will not establish immediate athletic eligibility. Note: No. (1) If a student transfers to another school zone to live with an appointed guardian without a bona fide move into that school zone by the parents, that student will be ineligible under the Transfer Rule. No. 2 under Note, If a student has been declared a "ward of the state" and placed by the Department of Human Resources (DHR), that student would meet the Transfer Rule requirement in the school zone where the student has been placed." The enclosure received in your letter reveals there has been a court order signed by the district judge in Louisiana which honors the requests of the parents and the guardian for a transfer of legal custody. This change of custody is not acceptable for immediate athletic eligibility as stated in the rule above.[16]

Stevens appealed Washburn's determination to the AHSAA's Eighth District

Board on August 10, 2004.[17]  Wade Lipscomb, Secretary/Treasurer of the Board,

advised Stevens that Washburn's decision had been sustained on August 17, 2004,

---

[16]Defendants' Ex. 3.

[17]Doc. no. 1 (Complaint) at ¶ 11.  The complaint refers to "Exhibit 6," but plaintiffs' submission did not contain that exhibit.

saying:

> The Eighth District Athletic Board met on Monday, August 16, 2004, at Scottsboro High School regarding the eligibility of Chris Keys. All members of the District Board were present, and Mr. Frank Stevens, Principal, and Mark Rose, Football Coach, represented North Jackson High School. Larry Morris recused himself from the hearing because he is the head football coach at Scottsboro and his team plays North Jackson during the year.
>
> The Eighth District Board upholds the ruling of Mr. Dan Washburn, Executive Director of the AHSAA on both points. The ruling was upheld on the first point because no new evidence was shown that Chris Keys was in good standing with his previous school. Even though Chris salvaged his credits to maintain academic eligibility by attending the Alternative School, he did not meet Louisiana State law for athletic eligibility by sitting out for two years. He had been expelled and ruled ineligible to participate in interscholastic athletics at his previous school, Port Barre High School.
>
> The ruling was upheld on the second point because it was not shown that Chris Keys was declared a "ward of the state." AHSAA rules will only allow Custody to determine eligibility if the person in question has been declared a "ward of the state."
>
> If you wish to appeal this ruling to the Central Board, you may do so by writing to Mr. Dan Washburn. If I can help in any way, please contact me.[18]

Stevens did appeal to the Central Board and, on August 25, 2004, Washburn

advised Stevens of the Board's decision:

> The Central Board of Control after hearing your presentation met in executive session to discuss the eligibility of Chris Keys, a student at North Jackson High School. The AHSAA staff and the eighth district

---

[18]Plaintiffs' Ex. 7.

representative were excused from the room.  After a lengthy discussion, the Board adjourned the executive session and met back in regular session.

The Central Board of Control voted unanimously to uphold the eligibility ruling by the Alabama High School Athletic Association (Dan Washburn) and the Eighth District Athletic Board.[19]

At this point in the chronological narrative of events, the clock must be rolled back to the date of July 29, 2004: *i.e.*, the day *after* Washburn orally (informally) told Coach Rose that Keys was not eligible; and, the day *before* Stevens sought an official ruling.  On that date, Gregory L. Case, plaintiffs' former attorney, first raised with Washburn the issue that another North Jackson football player (who is Caucasian) may have been ruled *eligible* to compete under circumstances similar to those of Keys (who is of African heritage).  Case wrote:

It has been brought to my attention that a similar situation existed wherein a white student who had disciplinary trouble, but was in good standing academically was allowed to transfer and play [football at North Jackson High School].  I do not understand the difference in these cases, however, I do not feel that you would apply the rules differently to different athletes.  I remain hopeful that we can work this situation out without the necessity of litigation.  I do not believe it is the intent of the AHSAA to continue to punish this young man for a mistake that was made, and for which he has already been punished.  I am asking that you review this situation.  Should you need anything further from me, I will be happy to provide it to you and your organization.[20]

---

[19]Plaintiffs' Ex. 10.

[20]Plaintiffs' Ex. 17.

14

Although Washburn responded to Case's letter on August 2, 2004 — the same date on which Washburn rendered an official ruling to Stevens[21] — he did not address Case's contention that another North Jackson student, possessing a racial heritage different from that of Christopher Keys, received different treatment.[22] Consequently, Case again wrote to Washburn on August 6, 2004, saying:

> I have received your letter of August 2, 2004 and seen the newspapers with regard to the eligibility of Chris Keys. I am very disappointed that we could not discuss this matter and try to work something out and that something this important has to be handled by correspondence. As I told you in my earlier letter it has been brought to my attention that a similar situation existed wherein a white student who had disciplinary trouble, but was in good standing academically was allowed to transfer and play. In January of 2003, a student by the name of [John Doe[23]] was discovered to have marijuana in his automobile at Trion High School in Georgia. He was suspended for one year because of a zero tolerance policy in Georgia. A guardianship was obtained by friends of the family and he applied for eligibility in August of 2003. His request was approved by the AHSAA. I do not understand the difference in these cases. If these policies are "clear cut situations" and "the rules are very clear" as you said in your Birmingham News article, then why are the outcomes in these cases different. I feel certain that the media attention that this case is receiving may force an answer to these questions.
>
> Were it not for this precedent case, I would completely understand that these administrative rules are vague and could be interpreted in the manner which you express in your letter and article, however the only

---

[21]See the text accompanying note 16 *supra*.

[22]Plaintiffs' Ex. 13, at unnumbered page 4.

[23]In the interest of protecting the privacy of this minor who is not a party to this action, he shall be referred to, as he was during the evidentiary hearing, as "John Doe."

differences I see in these cases are that the Sharriefs have actual custody of Chris Keys, and that Chris Keys is black, and a blue chip athlete. It is my understanding that North Jackson is preparing an appeal in this matter, but in the meantime, I would like to get an explanation as to why the "clear cut rules" were different a year ago, and a different outcome was obtained in what is essentially an identical case. I await your response.[24]

Case also enclosed a letter from Richard Lindsey, Superintendent of the Trion City Board of Education, dated August 5, 2004, which reads as follows:

TO WHOM IT MAY CONCERN:

In January of 2003, [John Doe] was a student at Trion High School, Trion City Schools, Trion, Georgia. During that month, [John Doe] was found to have marijuana in his vehicle and was withdrawn from Trion High School at that time. [John Doe] was not eligible to return to Trion for a period of one year. [John Doe] subsequently went to school in Alabama and has not applied for readmission to Trion High School.

Washburn responded to Case in a letter dated August 9, 2004, as follows:

I am in receipt of your letter of August 6, 2004 in which you state . . . that [John Doe] was expelled from Trion High School in Trion, Georgia in January 2003 and was allowed to participate at North Jackson High School in 2003-2004. If this was the case, then [John Doe] was ineligible to participate at North Jackson High School for the 2003-2004 school year.

This office has received no communication at this time from North Jackson High School concerning this matter. Therefore, no ruling was ever made concerning [John Doe]. This office would have no knowledge about this communication to North Jackson that [John Doe] had ever been suspended or had ever been expelled from Trion High

---

[24]Plaintiffs' Ex. 13, at unnumbered page 3.

16

School in Trion, Georgia.

> You state in your letter that "his request was approved by the AHSAA." If there is any written information to substantiate this claim, please forward to this office.[25]

As a result of the foregoing exchange of correspondence, Washburn requested

information relating to John Doe's eligibility in an August 9, 2004 letter to Stevens

reading as follows:

> This office has received information that [John Doe], a student athlete at North Jackson High School allegedly participated during the 2003-2004 school year as an ineligible athlete.

> The information received in this office indicates that [John Doe] was expelled from Trion High School in Trion, Georgia in January 2003 and was allowed to participate at North Jackson High School in 2003-2004.

> According to the information received in this office, [John Doe] transferred to North Jackson High School based on a change of legal custody through the probate court in Chattooga County where Trion High School is located.

> Please answer these allegations immediately in writing, forwarding to this office any information you have concerning this case.[26]

Stevens responded to Washburn's letter on August 16, 2004.[27]  He provided

a letter from Dr. Phil Williams, principal of Trion High School, dated *February 21,*

---

[25]Plaintiffs' Ex. 13.

[26]Defendants' Ex. 5.

[27]Defendants' Ex. 6.

*2003*, stating that John Doe "is currently in good standing with Trion High School in

regards [sic] to discipline and academics,"[28] as well as a copy of an order of the

Probate Court of Chattooga County, Georgia, granting temporary letters of

guardianship over the "ward" (*i.e.*, John Doe) to Randall Allison Smith and Kathleen

Callahan Smith.[29]  Stevens explained that the school had concluded John Doe was

eligible to compete in interscholastic athletics during the fall semester of the

preceding, 2003-2004 academic year based upon the letter of good standing from the

principal of Trion High School and the "court order declaring [John Doe] a ward of

the court."[30]

---

[28]*Id.* at unnumbered page 3.

[29]The Smiths are not related by blood or marriage to John Doe or his parents.  Indeed, the testimony presented to this court suggests that the Smiths, who are members of the North Jackson "Booster" club, possessed only the barest relationship with John Doe or his family prior to being granted custody by the Georgia court.

[30]Defendants' Ex. 6, at unnumbered page 1.  The reference to the Georgia "court order declaring [John Doe] a ward of the court." should be considered in conjunction with AHSAA's "Transfer Rule," pertaining to custody and legal guardianship, which reads as follows:

> Custody or legal guardianship assigned to anyone (including relatives) will not establish immediate athletic eligibility.

> **Note:** (1) If a student transfers to another school zone to live with an appointed guardian without a bona fide move into that school zone by the parents, that student would be ineligible under the Transfer Rule.

> (2) *If a student has been declared a* "ward of the state" *and placed by the Department of Human Resources* (DHR), that student would meet the Transfer Rule requirement in the school zone where the student has been placed.

Defendants' Ex. 1, at 30 (emphasis supplied).  However, there is no evidence that John Doe had been

On August 19, 2004, Washburn sought clarification of the inconsistency in the letters from Trion Superintendent of Education Richard Lindsey and Trion High School Principal Phil Williams with regard to John Doe's standing at Trion High School.[31]   Trion Principal Williams responded as follows:

> My name is Dr. Phil Williams and I am the principal of Trion High School in Trion, Georgia.  I am responding to the questioning of the eligibility of [John Doe] to participate in interscholastic athletics at North Jackson High School in Stevenson, Alabama for the 2003-2004 school year.  Although not familiar with the Alabama High School Athletic Association eligibility rules, I can provide pertinent information about [John Doe]'s status at Trion High School.
>
> [John Doe] was found to have marijuana in his possession in January, 2003.  [John Doe] was suspended (out of school) from Trion High for a period of nine school days.  Because [John Doe] did not live in the Trion School district he was withdrawn from Trion High School after the nine day suspension.  He was withdrawn from school due to "not meeting expectations" required from an out-of-district student. This was not a suspension.  [John Doe] was merely withdrawn from school.
>
> John Doe served his nine days out of school suspension discipline that was enforced.  After the nine days of suspension, [John Doe] was in good standing in regards to discipline and academics with Trion High School.  *He could have reapplied to Trion High School the following year* and [John Doe] would have been accepted.
>
> In conclusion, [John Doe] was *not* under suspension from Trion

"placed by the Department of Human Resources" of either the State of Georgia or State of Alabama in the home of the Smiths.  When the exception in "Note 2" does not apply, the student is required to reside in the home of a new family for one year in order to establish residence and, therefore, eligibility to participate in interscholastic athletics in the new school zone.  *Id.* at 29.

[31]Defendants' Ex. 7.

> High School *for a period of one year*.  He served his punishment
> dictated to him by the school system.  If you have any further questions
> regarding the issue, please direct them to my attention.[32]

Trion Superintendent of Education Lindsey sent the following letter to Washburn on

August 24, 2004:

> This letter is a follow-up to the one I wrote you on August 5,
> 2004, regarding [John Doe].  I was referring to [John Doe]'s withdrawal
> from Trion High School for the stated reasons in that letter.  [John Doe]
> was not allowed to return to Trion High School for a year because he
> was a non-resident student that did not live in the city limits of Trion,
> GA.  [John Doe] had served his suspension, as per board of education
> policy, from Trion High School and was in good standing with Trion
> High School in regards to discipline and academics as was stated by Dr.
> Phil Williams, the high school principal, in his letter to you on February
> 21, 2003.  It was his non-residency status that did not allow [John Doe]
> to be eligible to return to Trion High School for a period of one year.
>
> I hope this clears up any confusion in regards to [John Doe]'s
> status.[33]

Following review of the information and documentation provided by Stevens,

Lindsey, and Williams, Washburn wrote to Stevens on August 27, 2004 (*i.e.*, two

days after the Central Board of Control upheld Washburn's ruling that Keys was not

eligible to compete in interscholastic athletics in Alabama), saying:

> Thank you for your letter of August 16, 2004, responding to the
> request by this office concerning the eligibility in 2003-2004 of [John
> Doe].  According to the information received in your letter, [John Doe]

---

[32]Defendants' Ex. 8 (emphasis supplied).

[33]Defendants' Ex. 9.

enrolled in North Jackson High School on February 1, 2003. On February 21, 2003, North Jackson High School received a letter of good standing from the principal of Trion High School, Dr. Phil Williams, in regards [sic] to both discipline and academics. You also received a court order dated February 18, 2003, declaring [John Doe] a ward of the court and granting guardianship to Randall and Catherine Smith who live in your district.

Apparently, Mr. Kenneth Harding, the principal of North Jackson High School at that time, determined that [John Doe] was eligible based upon his review of the rules of the Alabama High School Athletic Association. This is evidenced by the Form 3 (eligibility) received in this office on August 8, 2003. North Jackson High School did not request an official ruling from the AHSAA concerning [John Doe]'s eligibility until now.

On August 25, 2004, you stated in our telephone conversation that North Jackson High School had no knowledge of any disciplinary matter involving [John Doe] while enrolled at Trion High School and specifically that North Jackson High School had no knowledge of possession of marijuana by this student.

If [John Doe] meets all other eligibility requirements, *he is declared eligible for the 2004-2005 school year* based on the information provided at this time. However, if the AHSAA is ever provided any information that North Jackson High School had knowledge that [John Doe] was not in good standing at Trion High School or that he was not declared a ward of the state,[34] then we will revisit this issue.[35]

According to testimony presented to this court, John Doe transferred from

Trion High School in Trion, Georgia (located in the *northwestern* corner of Chattooga

---

[34]*See supra* note 30.

[35]Plaintiffs' Ex. 11 (emphasis supplied).

County, Georgia, geographically contiguous to Jackson County in the *northeastern* corner of Alabama) to North Jackson High School during February of 2003, the second semester of the 2002-2003 school year. Coach Rose testified that, on March 31, 2003, Kenneth Harding — who then was principal of North Jackson High School — telephoned Washburn in Rose's presence, and confirmed John Doe's eligibility to play football for North Jackson during the forthcoming football season, which commenced in August of the 2003-2004 school year. According to a notation recorded in Rose's calendar, Washburn told Harding that John Doe was eligible.[36] Rose also testified that, prior to August of 2004, neither he nor the former principal was aware that John Doe had been found to be in possession of marijuana while a student at Trion High School. John Doe played for the North Jackson football team during the 2003 season, his junior year, and now is a senior on the squad. Coach Rose further testified that, even though John Doe is a "good high school football player," he is not college material. In contrast, plaintiff Christopher Keys is one of the top prospects in the nation and, according to Coach Rose, has been offered a scholarship to play football for Louisiana State University,[37] an offer that has not been withdrawn, despite the uncertainties about Keys's present eligibility.

---

[36]Plaintiffs' Ex. 15.

[37]Louisiana State University also is recruiting Ali Sharrief.

## II. DISCUSSION

Plaintiffs assert federal claims based upon 42 U.S.C. § 1983 against AHSAA, its Executive Director, Dan Washburn, and District 8 Board Member Wade Lipscomb, in their official and individual capacities, for violation of minor plaintiff Christopher Keys's rights to due process and equal protection of the laws as guaranteed by the Fourteenth Amendment, as well as claims based upon Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, "Title IX" (presumably of the Education Amendments of 1972), 20 U.S.C. § 1681 *et seq.*, and a claim of conspiracy under 42 U.S.C. § 1985.[38]  Defendants moved to dismiss the complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted.  The first issue that must be addressed is the standard to be applied when addressing defendants' motion to dismiss.

### A.    Standards for Reviewing a Rule 12(b)(6) Motion to Dismiss *versus* a Rule 56 Motion for Summary Judgment

The Federal Rules of Civil Procedure provide that, if matters outside the pleadings are presented to and considered by the court when ruling upon a Rule 12(b)(6) motion to dismiss, "the motion shall be treated as one for summary judgment

---

[38]Plaintiffs did not pursue the Title IX and § 1985 claims during the hearing conducted on September 23rd and 24th, and plaintiffs' "Brief in Support of Jurisdiction" filed on September 27, 2004, addresses only the claims based upon 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.  Even so, in an abundance of caution, the court will address the Title IX and § 1985 claims when applying the relevant legal standards.

and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rule 12(b), Fed. R. Civ. P.; *see also, e.g., Property Management & Investments, Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985) (holding that district court "has discretion as to whether to accept material beyond the pleading that is offered in conjunction with a 12(b)(6) motion," but that once the court decides to do so, "it must convert the motion to dismiss into one for summary judgment") (citations omitted). This allows the court's inquiry to be fact specific, and allows the nonmovant to demonstrate the existence of any genuine issues of material fact. Here, of course, the court *has considered* matters "outside the pleadings": two days of testimony and exhibits that were not attached to either the plaintiffs' complaint or the defendants' motion. Even so, this court is instructed by the Eleventh Circuit that it is error for the district court to fail to give ten days notice to all parties of its intention to convert a 12(b)(6) motion to dismiss into one for summary judgment.

> It is clearly the law in this circuit that whenever a district judge converts a 12(b)(6) motion to dismiss into one for summary judgment by considering matters outside the pleadings, the judge *must* give to all parties ten-days notice that he is so converting the motion. *Herron v. Beck*, 693 F.2d 125, 126 (11th Cir. 1982); *Underwood v. Hunter*, 604 F.2d 367, 369 (5th Cir. 1979). The purpose of this requirement is to make certain that the parties are aware of the conversion and have an opportunity to present documents and arguments for and against the granting of summary judgment. In this case, the court did not give

24

notice.  This was error.

*Property Management*, 752 F.2d at 605 (emphasis in original); *see also*, *e.g.*,

*Milburn v. United States*, 734 F.2d 762, 766 (11th Cir. 1984).[39]

Nevertheless, there are several circumstances in which a court may consider

matters outside the pleadings when ruling upon a 12(b)(6) motion to dismiss, without

formally converting it to a Rule 56 motion for summary judgment.  One occurs when

copies of documents are *attached* to the plaintiffs' complaint.  *See, e.g., Harris v. Ivax*

*Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) ("Ordinarily, the full text of [a

document] would not be part of the record under review for a dismissal under

---

[39]Failure to provide such notice may be harmless, however.  *E.g., Denis v. Liberty Mutual Insurance Co.*, 791 F.2d 846, 850 (11th Cir. 1986) (citing *Property Management*, 752 F.2d at 605; *McMillian v. City of Rockmart*, 653 F.2d 907, 911 (5th Cir. 1981)).  For example, when

> "all of the parties were well aware that the judge was converting the 12(b)(6) motion and . . . the parties made all the arguments and submitted all the documents that they would have presented had they received the notice," failure to notify is not reversible. *Property Management*, 752 F.2d at 605

> The purpose of the rule is to notify the parties that the court may dispose of the case by summary judgment so that "the nonmoving party will have an opportunity to marshal resources and . . . rebut[] the motion for summary judgment with every factual and legal argument available." *Milburn*, 734 F.2d at 766. [A party, therefore,] cannot be heard to attack the trial court for failure to give notice when his own pleadings demonstrate he had knowledge of the standard to be applied.  Thus, while it may have been error to fail to give ten days notice, that error was harmless.

*Denis*, 791 F.2d at 850 (footnote omitted).  Here, however, even though this court is satisfied that "the parties made all the arguments and submitted all the documents that they would have presented had they received" notice of the court's intention to consider defendants' motion to dismiss as a Rule 56 motion, this court cannot say "the parties were well aware that" the court had an intention to do so.  *Id.*  Certainly, no formal notice was provided.

25

Fed.R.Civ.P. 12(b)(6) *unless it was attached to the complaint*.") (emphasis supplied) (*citing* 5 Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1356, at 590-92 (1969)); *Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364, 1368 (11th Cir. 1997) (observing that 12(b)(6) motions are "limited primarily to the face of the complaint *and attachments thereto*") (emphasis added).

Further, when a defendant attaches to its motion to dismiss a document that is central to the claims in a plaintiffs' complaint, and the contents of that document are not in dispute, the court may refer to the document without converting the motion into one for summary judgment. *Harris*, 182 F.3d at 802 n.2 (observing that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute"). Stated differently, a court may consider such documents as

> part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs' complaint and are central to her claim."). . . .

*Brooks*, 116 F.3d at 1369.

Virtually all of the documents taken into account by this court were attached as exhibits to either the plaintiffs' complaint or the defendants' motion to dismiss,

then later offered during the evidentiary hearing on plaintiffs' motion for a temporary

restraining order and preliminary injunctive relief.  For such reasons, the court shall

apply the normal standards for reviewing a Rule 12(b)(6) motion.

The Federal Rules of Civil Procedure require only that a complaint contain a

"'short and plain statement of the claim' that will give the defendant fair notice of

what the plaintiffs' claim is and the grounds upon which it rests." *Conley v. Gibson*,

355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (quoting Fed. R. Civ. P.

8(a)(2)).[40]  Consequently, a complaint should not be dismissed for failing to state a

---

[40]With but few exceptions (fraud claims being one, *see* Fed. R. Civ. P. (9)(b)), there are only three requirements for pleading a claim in a federal action: "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . ., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a).  "There are two other provisions of Rule 8 that are pertinent: 'Each averment of a pleading shall be simple, concise, and direct.  No technical forms of pleading are required.' Fed. R. Civ. P. 8(e)(1); and 'All pleadings shall be so construed as to do substantial justice.' Fed. R. Civ. P. 8(f)." *Gorski v. New Hampshire Dept. of Corrections*, 290 F.3d 466, 473 n.5 (1st Cir. 2002).

As the Eleventh Circuit observed in *Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364 (11th Cir. 1997),

> [t]he purpose of a Rule 12(b)(6) motion is to test the facial sufficiency of the statement of [a plaintiffs'] claim for relief.  It is read alongside Fed.R.Civ.P. 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  The rule is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity, and the analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto.  . . .

*Id.* at 1368-69 (citation omitted); *see also Conley v. Gibson*, 355 U.S. 41, 47-48, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").

claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46, 78 S. Ct. at 102.[41]  Even so, pleadings must be "something more than an ingenious academic exercise in the conceivable." *Marsh v. Butler County*, 268 F.3d 1014, 1037 (11th Cir. 2001) (*en banc*).  Although notice pleading may not require that the pleader allege a "specific fact" to cover every element, or allege "with precision" each element of a claim, the Eleventh Circuit has explained that the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Roe v. Aware Woman Center for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001), *cert. denied*, 534 U.S. 1129, 122 S. Ct. 1067, 151 L. Ed. 2d 970 (2002).

When ruling upon a Rule 12(b)(6) motion, the court must accept all well-

---

[41] *See also, e.g., Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984) (holding that a complaint should be dismissed for failure to state a claim "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations" of the plaintiffs' complaint); *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir. 2001) (*en banc*) (quoting *Conley*, 355 U.S. at 45-46, 78 S. Ct. at 102); *Magluta v. Samples*, 256 F.3d 1282, 1282 (11th Cir. 2001) (same) *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992) ("A complaint may not be dismissed unless the plaintiff can prove no set of facts which would entitle him to relief."); *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.) ("[T]he 'accepted rule' for appraising the sufficiency of a complaint is 'that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.'") (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)), *reh'g denied*, 840 F.2d 25, *cert. denied*, 486 U.S. 1055, 108 S. Ct. 2822, 100 L. Ed. 2d 923 (1988); *Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986) (same).

pleaded facts as true, and construe them in the light most favorable to the non-moving party. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984); *see also, e.g., Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364, 1369 (11th Cir. 1997); *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983). Further, "[a] complaint may not be dismissed because the plaintiffs' claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* possible theory." *Brooks*, 116 F.3d at 1369 (emphasis in original) (citation omitted).

Thus, the threshold requirements for a complaint to survive a Rule 12(b)(6) motion to dismiss are "exceedingly low." *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 703 (11th Cir. 1985). Such motions accordingly are "viewed with disfavor and rarely granted." *Brooks*, 116 F.3d at 1369 (citing *Madison v. Purdy*, 410 F.2d 99, 100 (5th Cir. 1969), and *International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service*, 400 F.2d 465, 471 (5th Cir. 1968)). Even so,

> the complaint must state a cause of action sufficient to affirmatively show the plaintiff is entitled to relief, for
>
> > [i]t is not enough, to indicate merely that the plaintiff has a grievance but sufficient detail must be given so that the defendant, and the Court, can obtain a fair idea of what the plaintiff is complaining, and can see that there is some legal basis

for recovery.

*Fullman v. Graddick*, 739 F.2d 553, 556 (11th Cir. 1984) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.13, at 8-118 (2d ed. 1984)).

**B.     Application of Standards to Plaintiffs' Claims**

The court concludes that plaintiffs' claim based upon Title VI of the Civil Rights Act of 1964 is due to be dismissed. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity *receiving Federal financial assistance.*" 42 U.S.C. § 2000d (emphasis supplied). The complaint does not contain an allegation that AHSAA receives federal financial assistance, and plaintiffs have not presented evidence of that factual element.

For the same reason, plaintiffs' claim based upon Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, is due to be dismissed. Moreover, Title IX prohibits *sex* discrimination, which is not at issue here.

Plaintiffs also assert claims based upon 42 U.S.C. § 1983, alleging denial of Fourteenth Amendment due process and equal protection rights by AHSAA, and by Washburn and Lipscomb in their official and individual capacities.

Section 1983 provides a means of seeking redress against governmental entities

30

and officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes. The statute was enacted for the express purpose of enforcing the Fourteenth Amendment.[42]  In pertinent part, it provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . . .

42 U.S.C. § 1983.

The two essential elements of a § 1983 claim are:  (1) the conduct complained

---

[42] *See, e.g., Mitchum v. Foster*, 407 U.S. 225, 92 S. Ct. 2151, 32 L. Ed. 2d 705 (1972):

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . . It was "modeled" on § 2 of the Civil Rights Act of 1866, . . . and was enacted for the express purpose of "enforc[ing] the provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment. As a result of the new structure of law that emerged in the post-Civil War era — and especially of the Fourteenth Amendment, which was its centerpiece — the role of the Federal Government as a guarantor of basis federal rights against state power was clearly established. . . . Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.

*Id.* at 238-39, 92 S. Ct. at 2159-60 (citations and footnotes omitted).

31

of was committed by a person acting under color of state law; and (2) this conduct deprived plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S. Ct. 1908, 1913, 68 L. Ed. 2d 420 (1981), *partially overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *see also Burch v. Apalachee Community Mental Health Servs., Inc.*, 840 F.2d 797, 800 (11th Cir. 1988) (*en banc*), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990).

Defendants do not contest the first element. As for the second element — and speaking now only with respect to plaintiffs' denial of due process claim — it is well settled that there is no right to play high school football grounded in the Due Process Clause of the Fourteenth Amendment.

> For better or worse, the due process clause of the fourteenth amendment does not insulate a citizen from every injury at the hands of the state. "Only those rights, privileges and immunities that are secured by the Constitution of the United States or some Act of Congress are within the protection of the federal courts. Rights, privileges and immunities not derived from the federal Constitution or secured thereby are left exclusively to the protection of the states." *The privilege of participating in interscholastic athletics must be deemed to fall in the latter category and outside the protection of due process.*

*Mitchell v. Louisiana High School Athletic Association*, 430 F. 2d 1155, 1158 (5th

Cir. 1970)[43] (footnotes omitted & emphasis supplied). Accordingly, plaintiffs' § 1983 claim based upon denial of due process also will be dismissed.

With respect to plaintiffs' § 1983 claim based upon denial of equal protection, plaintiff asserts that defendants unequally administered AHSAA's facially neutral eligibility rules by ruling that Keys (an African American) was ineligible to compete in interscholastic athletics during the present academic year, while allowing John Doe (a Caucasian) to do so, not only during the present school year, but also in the preceding, 2003-2004 academic year. To survive a motion to dismiss, plaintiff must allege that Keys was treated differently (and less favorably) than a similarly situated person of a different race, and that defendants unequally applied facially neutral rules in a discriminatory manner in order to discriminate against him on the basis of his race. *See Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) (citing *E & T Realty v. Strickland*, 830 F.2d 1107, 1109-10 (11th Cir. 1987)). Plaintiffs' complaint contains the following allegations:

> 19.    Further, at the time of Washburn's aforesaid representation before the Central Board, Washburn knew that a mirror case existed at North Jackson High School, wherein a student transferee from Georgia, who had the exact same disciplinary action as Keys, and had been expelled from regular school, but was given a letter of good standing by his

---

[43]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

principal, and wherein residents of the North Jackson school district had been awarded Temporary Letters of Guardianship over said student by a Probate Judge in the State of Georgia was deemed by AHSAA to be eligible to play football at North Jackson High School. In fact, Stevens asked Washburn about the status of this case, which had been pending before Washburn since August of 2003, immediately following the hearing. The most notable non-similarity in the two cases is that the Georgia student is white, while Keys is African American. Plaintiff hereby asserts that the blatant omission of this Georgia case in his response to the Central Board's request for any similar cases was fraudulent and/or deceptive.

20.   On August 25, 2004, Washburn sent a letter to Stevens informing him that: "The Central Board of Control voted unanimously to uphold the eligibility ruling by the Alabama High School Athletic Association (Dan Washburn) and the Eighth District Athletic Board." . . . On the same date Washburn sent a letter to Stevens informing him that the aforesaid Georgia student was eligible to play football.

21.   Plaintiff hereby avers that the aforesaid disparity in the Defendants' determination that he was not eligible to participate in athletic competitions, while the similarly situated white Georgia student was eligible to participate in competitive sports on the same date constitutes unlawful discrimination due to his race in violation of the Title VI and Title IX prohibitions against discrimination on the basis of race as set out in 42 U.S.C. § 2000d et seq.; and in violation of his constitutional right to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution, and by 42 U.S.C. § 1983 and 42 U.S.C. § 1985.[44]

As stated during oral argument on the motion to dismiss, the court concludes that plaintiffs' complaint sufficiently states a claim for relief under 42 U.S.C. § 1983 against AHSAA and Washburn for denial of equal protection. Accordingly,

---

[44]Doc. no. 1 (Complaint).

defendants' motion to dismiss will be denied as to this claim.

Plaintiffs' claim against Lipscomb, however, is due to be dismissed. While the complaint alleges that Lipscomb participated in the process culminating in the AHSAA's Central Board of Control's ruling that Keys was not eligible to compete as a member of the North Jackson High School football team, there is no allegation that Lipscomb played any role in the alleged different treatment of John Doe by AHSAA and Washburn.

Finally, plaintiffs assert a civil conspiracy claim under 42 U.S.C. § 1985. Although plaintiffs fail to specify the subsection of § 1985 under which their claim is brought, § 1985(3) is the only relevant provision. Section 1985(3) provides for the recovery of damages by a party who is injured as a result of a conspiracy to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws. The statute reads as follows:

### (3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from

> giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). The Eleventh Circuit outlined the elements of a claim based upon this statute in *Childree v. UAP/AG Chem, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir. 1996), saying:

> The elements of a cause of action under § 1985(3) are: (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*See also Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627-28 (11th Cir. 1992) (same); *Burrell v. Board of Trustees of Georgia Military College*, 970 F.2d 785, 793-94 (11th Cir. 1992) (same).

The first element — "a conspiracy" — means that a plaintiff "must show an agreement between 'two or more persons' to deprive him of his civil rights." *Dickerson v. Alachua County Commission*, 200 F.3d 761, 767 (11th Cir. 2000)

36

(quoting 42 U.S.C. § 1985(3)).

The second element — addressing the "purpose" of the conspiracy — "requires a showing of 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 829, 103 S. Ct. 3352, 3356, 77 L. Ed. 2d 1049 (1983) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798 29 L. Ed. 2d 338 (1971)); *see also Lucero*, 954 F.2d at 627-28 (same); *Burrell*, 970 F.2d at 793-94 (same).

> The purpose of § 1985 was to stifle the serious class-based deprivation of constitutional rights by private parties, not to serve as a general federal tort law, and, as such, a claim under § 1985(3) requires the proof of invidious discriminatory intent as well as the violation of a serious constitutional right protected not just from official, but also from private encroachment.

*Trawinski v. United Technologies*, No. 02-13276 (11th Cir. Dec. 3, 2002).

Here, the complaint contains the following allegations that ostensibly pertain to plaintiffs' claim of conspiracy:

> 6.     Toward the end of July, 2004, Football Coaches Mothershed at Deshler High School and Curtis at UMS-Wright phoned Dan Washburn, the Executive Director of AHSAA and told him that Keys was not eligible to play football at North Jackson High School located in Stevenson, Alabama.     Thereafter, on July 23, 2004, Washburn responded to these complaints by phoning Frank Stevens [hereinafter "Stevens"], Principal of North Jackson High School, and issuing a telephonic ruling that Keys was not eligible to play football.  The

37

AHSAA Handbook [hereinafter "Handbook"] . . . states that "**A verbal opinion or statement is not an official ruling**." Accordingly, Washburn's telephonic ruling on the aforesaid coaches' telephonic complaints violated AHSAA's Bylaws. Moreover, at the time of these telephonic discussions, Keys resided in the State of Louisiana in the custody of his parents; Keys had not moved to Alabama; and Keys was not enrolled in an Alabama school. Therefore, Plaintiff hereby avers that Washburn's acceptance of the aforesaid telephonic complaints, and his actions thereupon constitute: arbitrariness, collusion, fraud, lack of jurisdiction; a violation of AHSAA's Bylaws; and a violation of Keys [sic] constitutional rights to due process, to equal protection, and to the privileges and immunities guaranteed by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983 and 42 U.S.C. § 1985.[45]

. . . .

12.     On August 12, 2004, the District 8 Board met at Scottsboro High School. Present in attendance were the District 8 Board Members, Stevens, Head Football Coach Mark Rose [hereinafter "Rose"], Sharrief, Keys, the undersigned counsel, and others. During this hearing, no charges, and no evidence in support thereof were presented to the Board. There was no requirement for Washburn to present his case and determination of Key's [sic] non-eligibility to play football at North Jackson; nor any introduction of the appellate issues; and the fact that the Board already knew the aforesaid information indicate [sic] that such information was provided to them *ex parte*. The District 8 Board's Hearing consisted of the unrebutted testimony of Stevens, Rose, and others who spoke in Keys' defense. Stevens informed the Board that he had submitted new evidence . . . which showed that Keys was academically eligible and in "good standing" with his transferring school. Additionally, the undersigned counsel presented the Alabama law, which mandates that this State must accord full faith and credit to child custody Orders from other States, and which authorizes the registration of out of state custody rulings. . . . The Board disbanded upon learning that the undersigned counsel was present, and one of its

---

[45]Doc. no. 1 (Complaint) ¶ 6, at 4-5 (emphasis in original & footnote omitted).

members, Lipscomb, subsequently retaliated against the undersigned counsel, through her fifteen year old nephew.  Thereafter, Wade Lipscomb [hereinafter "Lipscomb"], a member of the District 8 Board phoned Stevens and arranged for the Board to meet exclusively with Stevens and Rose.  Neither Sharrief, nor Keys were permitted to attend. The District 8 Board met on August 16, 2004 with Stevens and Rose; and in a letter dated August 17, 2004, . . . Lipscomb reported its decision upholding the ruling of Washburn on both points, to wit:

> The ruling was upheld on the first point because no new evidence was shown that Chris Keys was in good standing with his previous school. . . .

> The ruling was upheld on the second point because it was not shown that Chris Keys was declared a "ward of the state." AHSAA rules will only allow Custody to determine eligibility if the person in question has been declared a "ward of the state."[46]

. . . .

15.    AHSAA's Bylaws . . . and its Form 3 . . . do not contain a requirement for students' disciplinary, nor criminal records to be submitted to them.  Accordingly, Plaintiff avers that the lack thereof clearly indicates that AHSAA does not consider the same in determining athletic eligibility.  Moreover, during the Central Board's Hearing, evidence was presented that in the Northern District, and possibly other judicial districts, students who are currently suspended or expelled and are enrolled in an alternative school are permitted to participate in competitive sports; and AHSAA acknowledged the veracity of the aforesaid evidence.  Further, Keys has never been charged with, nor convicted of any criminal offense.  However, inasmuch as AHSAA does not collect disciplinary, nor criminal information on potential participants in athletic events, AHSAA does not know, and apparently has "no need to know" whether other persons charged with disciplinary actions, or whether persons charged with criminal offense are currently participating in competitive sports.  Therefore, AHSAA's finding that

---

[46]*Id.* ¶ 12, at 7-8 (footnote omitted).

Keys was not in "good standing" because he had been expelled from regular school, not only contradicts his transferring school's finding, it also conflicts with AHSAA's policy and procedure in this judicial District, which permits students currently enrolled in alternative schools to participate in competitive sports. Accordingly, AHSAA and the other Defendants singled Keys out and treated him differently by barring him from playing football ostensibly due to his former school's disciplinary action.  Plaintiff further avers that *the real reason he was singled out was because of his national rankings, and the conspiracy to prevent him from playing competitive sports in this state as stated hereinabove*, and that the aforesaid actions of the Defendants constitute fraud, collusion, arbitrariness, lack of jurisdiction and a denial of his constitutional right to due process and to equal protection, and they are manifestly unjust.[47]

. . . .

22.    Plaintiff further asserts that the District 8 and Central Board's decisions upholding Washburn's decision of non-eligibility were proximately caused by the initial fraud, collusion, arbitrariness and lack of jurisdiction resulting from the telephonic discussions between two "would be competitive coaches" and Washburn, and therefore the Board's actions constitute, or were proximately caused by, fraud, collusion, arbitrariness and lack of jurisdiction, in violation of state law and 42 U.S.C. § 1985. . . .[48]

Plaintiffs appear to contend that there were two conspiracies: the first, between

"Mothershed and Curtis" (who coach football rivals of North Jackson High School)

and Washburn; and second, among members of the District 8 Board and Washburn.

As for the conspiracy between the rival football coaches and Washburn,

plaintiffs have failed to sufficiently allege "an *agreement* between 'two or more

---

[47]*Id.* at 9-10.

[48]*Id.* at 13-14.

persons' to deprive [Keys] of his civil rights." *Dickerson,* 200 F.3d at 767 (quoting 42 U.S.C. § 1985(3)) (emphasis supplied). At most, plaintiffs' complaint asserts only that the coaches brought the issue of Keys's eligibility to Washburn's attention. "In conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged. It is not enough to simply aver in the complaint that a conspiracy existed. A complaint may be justifiably dismissed because of the conclusory, vague and general nature of the allegations of conspiracy." *Fullman v. Graddick,* 739 F.2d 553, 556-57 (11th Cir. 1984).

With respect to the alleged conspiracy among AHSAA's District 8 Board Members and Washburn, plaintiffs' claim also must fail. Because the District 8 Board Members and Washburn all are members of the same entity, the intracorporate conspiracy doctrine bars plaintiffs' claim. That doctrine insulates corporate employers and employees acting as agents of the corporation from § 1983 or § 1985(3) claims alleging a civil conspiracy among a private or public corporation and its officers and employees. *See McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036 (11th Cir. 2000) (*en banc*) ("[A]cts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."); *Dickerson,* 200 F.3d at 767 ("Under the intracorporate conspiracy doctrine, a corporation's employees, acting as agents of the corporation,

41

are deemed incapable of conspiring among themselves or with the corporation.");

*Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)

("A corporation cannot conspire with itself any more than a private individual can.");

*Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1977), *aff'g*, 421 F. Supp. 12 (E.D. La.

1976) (applying the intracorporate conspiracy doctrine to bar a § 1985(3) claim

against a public university and its officials); *see also Wright v. Illinois Dept. of*

*Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994) (holding that the

intracorporate conspiracy doctrine applies not just to private corporate entities, but

also to governmental agencies such as the state Department of Children and Family

Services); *Run After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) ("The Tribal

Council as an entity or governmental body cannot conspire with itself.").

> Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves. The doctrine is based on the nature of a conspiracy and the legal conception of a corporation. It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks Inc.*, 140 F.3d 898, 912 (11th Cir.1998) (explaining that a civil conspiracy ordinarily requires "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff"). However, under basic agency principles, the acts of a corporation's agents are considered to be those of a single legal actor. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir.1981); *see also United States v. Hartley*, 678 F.2d 961, 970 (11th Cir.1982). Therefore, just as it is not legally possible for an

individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself. *See Dussouy*, 660 F.2d at 603 (noting that "the multiplicity of actors necessary to conspiracy" is negated when the agents' acts are attributed to the corporation and the corporation and its agents are viewed as a single legal actor); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952) (explaining that "[i]t is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.").

*McAndrew*, 206 F.3d at 1036.

The doctrine clearly applies to *public* employers and employees, not just private ones. For example, the plaintiff in *Chambliss v. Foote*, 421 F. Supp. 12 (E.D. La. 1976), was a non-tenured professor who brought suit against the University of New Orleans and its administrative officials, alleging that the university officials' decision to not renew her teaching contract was the product of a conspiracy to violate her civil rights. The district court concluded that "the university and its officials are considered as constituting a single legal entity which cannot conspire with itself," and dismissed the plaintiff's § 1985(3) claim. *Id.* at 15. The former Fifth Circuit "affirm[ed] on the basis of the district court's opinion." *Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1976). The panel opinion in *Chambliss*, adopting the opinion of the district court, remains precedent binding upon this court, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting all Fifth Circuit

decisions handed down prior to the close of business on September 30, 1981 as binding precedent in the newly created Eleventh Circuit), as the Eleventh acknowledged in *McAndrew*, 206 F.3d at 1038 n.8, and *Dickerson*, 200 F.3d at 768 n.8.

Moreover, in a case in which an African-American plaintiff claimed that his demotion from shift commander of county jail employees to sergeant was the result of a conspiracy, the Eleventh Circuit held that the intracorporate conspiracy doctrine barred the plaintiff's civil conspiracy claim against the county government and employees of the same public entity:

> This case, like *Chambliss*, involves a § 1985(3) claims against *actors who are part of a single, public entity* and who allegedly conspired to interfere with civil rights. Also like *Chambliss*, this case does not involve even a single conspirator from outside that public entity and does not involve any criminal conduct. Thus, under *Chambliss*, the County jail and its employees are considered to constitute a single legal entity that cannot conspire with itself. *See Chambliss*, 421 F. Supp at 15.

*Dickerson*, 200 F.3d at 768 (emphasis added).

More recently, the Eleventh Circuit, sitting *en banc*, reaffirmed that the intracorporate conspiracy doctrine bars § 1983 and § 1985(3) civil conspiracy claims against governmental employers and employees of the same public entity, saying simply: "*Chambliss* and *Dickerson* remain the law in this Circuit." *McAndrew*, 206

44

F.3d at 1038 (*en banc*).

Even if the intracorporate conspiracy doctrine were not applicable, the court finds that plaintiffs's complaint does not sufficiently allege that the District 8 Board Members agreed among themselves to deny Keys's civil rights, or that they agreed with Washburn to do so. Accordingly, plaintiffs' civil conspiracy claims under 42 U.S.C. § 1985 are due to be dismissed.

**C.    Motion for Temporary Restraining Order and Preliminary Injunction**

A plaintiff seeking the entry of a temporary restraining order or preliminary injunctive relief must satisfy four prerequisites:  (1) demonstrate a substantial likelihood of ultimately prevailing on the merits; (2) show that he will suffer irreparable harm if an injunction maintaining the status quo *pendente lite* does not issue; (3) prove that the threatened injury to plaintiff outweighs whatever damage the proposed injunction may cause the opposing parties; and (4) demonstrate that the injunction will not be adverse to the public interest. *See, e.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville, Florida*, 896 F.2d 1283, 1284 (11th Cir. 1990). *See generally Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d* § 2948, at 131-

33 (2d ed. 1995).[49]

The requirement that a movant demonstrate a substantial likelihood (or "probability"[50]) of ultimately prevailing on the merits does not mean that the movant must actually succeed on the merits. *See Johnson v. United States Department of*

---

[49]The first of these prerequisites implicitly may have been bent by the United States Supreme Court's December 9, 2000 decision in *Bush v. Gore*, 531 U.S. 1046, 121 S. Ct. 512, 148 L. Ed. 2d 553 (2000), staying the implementation of the mandate of the Supreme Court of Florida to recount votes cast in that State during the Presidential election. The factors traditionally applied by federal courts when determining whether a stay of judgment should be granted pending appeal are virtually identical to the foregoing prerequisites for entry of a temporary restraining order or preliminary injunctive relief. Those stay factors are: (1) whether the stay applicant has made *a strong showing* that he is *likely* to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies. *See, e.g., Hilton v. Braunskill*, 481 U.S. 770, 777, 107 S. Ct. 2113, 95 L.Ed.2d 724 (1987).

However, the Supreme Court recast the first stay factor in its ultimate decision on the 2000 Presidential vote recount in the State of Florida, *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed.2d 388 (2000) (*per curiam*), decided on December 12, 2000. There, the Court explained the December 9, 2000 decision by a majority of the Justices to grant the extraordinary relief of a stay of the Florida vote recount in the following manner:

> When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.
>
> Given the Court's assessment that the recount process underway was *probably* being conducted in an unconstitutional manner, the Court stayed the order directed the recount so it could hear this case and render an expedited decision. ...

*Bush v. Gore*, 531 U.S. at 109, 121 S. Ct. at 532 (emphasis supplied). In other words, the first factor for determining whether to grant a stay was recast from "whether the stay applicant has made *a strong showing* that he is *likely* to succeed on the merits" to the following, much less onerous burden: "whether the stay applicant has *shown* that he *probably* will succeed on the merits."

The correctness of this assessment of the impact of *Bush v. Gore* upon the factors for entry of a stay, or the parallel prerequisites for the entry of a TRO or a preliminary injunction, is not for this court to say — at least not in this case, because the resolution of the present controversy does not depend upon it.

[50]See the preceding footnote.

*Agriculture,* 734 F.2d 774, 782 (11th Cir. 1984). The movant simply must show a "likelihood" of success, because of the underlying rationale of both temporary restraining orders and preliminary injunctions:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S. Ct. 1830, 1833, 68 L. Ed. 2d 175 (1981).

As stated above, plaintiffs' lone surviving federal claim is based upon 42 U.S.C. § 1983, alleging denial of equal protection by AHSAA and its Executive Director Dan Washburn in the application of AHSAA's eligibility rules. Plaintiff must show that Keys was similarly situated to John Doe, that Keys and Doe are of different races, and that AHSAA and Washburn unequally applied facially neutral eligibility rules for the purpose of discriminating against Keys because of his race.

The facts surrounding John Doe's eligibility to play football for North Jackson High School during the 2003 football season (*i.e.*, the preceding, 2003-2004 academic

47

year) are murky at best.  Although Coach Rose testified that neither he nor former

North Jackson principal Kenneth Harding knew about the circumstances of John

Doe's transfer to North Jackson High School — *e.g.*, that he was found to be in

possession of marijuana while a student at Trion High School in Trion, Georgia, and

that he had not actually been declared a "ward of the state" of Georgia or Alabama

for purposes of the Transfer Rule[51] — it appears to the court that the question of his

eligibility to compete during the 2003 football season traveled like a stealth fighter

under AHSAA's radar screen.  As for the 2004 football season, even if John Doe had,

in fact, been suspended from Trion High School for one year, as at least some of the

documentary evidence suggests, that suspension would have ended in February of

2004.  As best the court can determine, John Doe also would have satisfied the

Transfer Rule in February of 2004, since he had lived with his guardians for a period

of one year.[52]

Even assuming that Keys established that he was similarly situated to John

Doe, and even if Washburn, on behalf of AHSAA, erroneously or arbitrarily applied

the eligibility rules, plaintiffs' claim for a temporary restraining order or preliminary

injunctive relief fails for lack of evidence that Washburn and the AHSAA acted with

---

[51]*See supra* note 30.

[52]*See* Defendants' Ex. 1, at 29, 30.

discriminatory intent because of Keys's race. "The unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S. Ct. 397, 401, 88 L. Ed. 497 (1944). "Unequal administration of facially neutral legislation can result from either misapplication (*i.e.*, departure from or distortion of the law) or selective enforcement (*i.e.*, correct enforcement in only a fraction of cases). In either case, a showing of intentional discrimination is required." *E & T Realty v. Strickland*, 830 F.2d 1107, 1113 (11th Cir. 1987) (citing *Snowden*, and collecting cases). "Mere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause. There must be intentional discrimination. Even arbitrary administration of a statute, without purposeful discrimination does not violate the equal protection clause." *E & T Realty*, 830 F.2d at 1114 (citations omitted). Accordingly, plaintiffs have not established a substantial likelihood (or "probability"[53]) of prevailing on the merits of their equal protection claim, such that injunctive relief would be proper.

In view of the foregoing, the court need not address the remaining factors. The

---

[53]*See supra* note 49.

49

court observes, nevertheless, that plaintiffs have not demonstrated that Keys would be irreparably harmed if an injunction did not issue. Keys has received a scholarship offer from Louisiana State University that has not been rescinded, even in light of his present ineligibility to play football during his senior year of high school.

For all of these reasons, plaintiffs' motion for a temporary restraining order and for preliminary injunctive relief is due to be denied. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this ___1st___ day of October, 2004.

_____
United States District Judge